Good morning, Your Honor. May it please the Court, James Osborne on behalf of the appellant, Kevin Sarver. Your Honors, may I reserve about two-thirds, I mean the last quarter of my argument for response? Well, you keep track of your time. It counts downward and we'll try and help you out. And so long as you have something interesting to say, we'll not cut you off. Thank you, Your Honor. We get to be the judge of interesting. Thank you, Your Honor. Your Honor, I think that the trial court here made some crucial errors with respect to how it ruled on the motion for summary judgment in this particular case. I think, first off, that the trial court did not view the evidence in the light most favorable to the non-moving party. I think the trial court decided tribal issues of fact regarding credibility, regarding motive, regarding causation, and regarding foreseeability. What's your claim that they breached a duty owed that, what is it, TCA breached a duty owed to your client? What was the duty that they breached? Your Honor, first off, the very simple duty is enunciated underneath California law, which is that everybody in the state has a reasonable duty of care to anyone else. And that's in the civil code. So you're not arguing here that at this particular site that they had a duty to provide security guards? No, Your Honor. That's not your argument? No, Your Honor. Or monitoring or video cameras or anything like that? Well, I do think that there's a difference clearly in the law between the duty to hire security guards and the duty to take other reasonable steps that any landowner would take in this particular situation. Take that one step further. What were the reasonable steps that that duty encompassed? Well, in this particular case, and I think we addressed some of this in the reply brief, you could warn people not to patronize the polishers. You could tell the polishers not to enter into the restaurant or any of the other facilities. You could tell people to use caution, just like at a supermarket when they tell you, you know, don't deal with the panhandlers. You know, this is different from most of the cases that the California Supreme Court has decided and the California Court of Appeal has decided. Most of those cases are dangers coming from until the assault happens from an unknown assailant. That is to say, it's a generalized worry about you might get raped and the end gets raped by somebody. Until that person shows up, we don't know who it is. This is different because the assailant here is a known person. The group from which the assailant comes is a known group, so that we have testimony from Mr. Woods. That affidavit, or I guess you guys always call it a declaration, although the federal practice would call it an affidavit. He says, well, in particular, Mr. Ferris, I wouldn't go within six feet of him because I thought he was dangerous. So this is not the random assault from somebody who's unknown until the time of the assault. This is an assault by somebody they knew was dangerous, someone whom they had previously told. Mr. Woods had said, you know, five times I told him to stay off the property. A fairly simple proposition, once they understand the danger of that guy, would be to say, you never come on this property. Two points, Your Honor. First off, there are no other cases that are factually really analogous to this case. I agree with you. This case really stands alone, not only for the fact that the assailant was known, but for the fact that the corporation here had a very symbiotic relationship with these polishers. On one hand, there was a declaration from the then manager who basically did the three blind mice. You know, I didn't know anything. I didn't see anything. Meanwhile, the person who she had tasked with responsibility for securities, Mr. Woods, who Your Honor just referred to, he said, look it, we dealt with these polishers all the time out there. And I was afraid of Mr. Ferris. He saw Ferris five times. Now, when you see Hugh Redwoods, Mr. Woods looks like he could be a member of the California Hells Angels. I mean, he is a big man. He is – Does it claim now that they had a duty to protect him against Mr. Ferris? Well, I think they did have a duty to protect him against Mr. Ferris. How did they breach that duty? They breached that duty by not calling the police and telling the police that they had a known threat out here or by keeping all of these polishers off the premises, most importantly, Your Honor. Why all? This guy, Mark Ord, Mark Ord was Jeffrey Wade Ferris' best friend. And Hugh Woods, all right, let Mark Ord on that property. And he let him on the property in exchange for providing a service. Mr. Woods was supposed to clean up the property. So he lets this polisher, Mark Ord, on the property. And Mark says, well, let my best friend come on. Jeffrey Wade Ferris was Mark Ord's best friend. That's why Hugh Woods had a problem dealing with him. But in order to say that, he would have had to kind of impeach himself. So he just kind of gingerly tiptoed up to it. But that's a fair inference, I mean, more than a fair inference, you know, for the jury in this case. So they knew this guy was a risk. They knew he was a methamphetamine addict. The police officer out there, the guy whose beat encompassed this. Was every methamphetamine addict a danger? I bet most are. I know that my wife and my kids are afraid when they walk down parts of Los Angeles, when they see some people who they think just by their appearance are dangerous. I mean, this business knew that these people were on their property. And that's why I think it's really important to look at this case as factually distinguishable from almost every other case out there. He specifically argued to Judge Wright in the district court that the duty they breached to your client was to, they didn't, they had a duty to keep Mr. Ferris off the property. Is that the argument you advanced in the district court? I advanced the argument that they had a duty to protect all of the truck drivers who came onto that property. And just so you know, Your Honor, I probably, maybe I had a minute in front of Judge Wright. I mean, I think the evidence is in the record, of course. But in terms of oral argument, I mean, it was... What was in your papers in terms of your argument? Pardon me? What was in your papers in terms of your argument in front of Judge Wright? Well, that they had a duty to protect the plaintiff who was a foreseeable patron. Remember, Your Honor, this is a business. And was it, did you say they had a duty to protect the plaintiff against the polishers generally, against Ferris in particular because he stood out among the polishers as particularly dangerous? I mean, what was the form of that argument? I confess I've read a lot in the background here, but I've not read your brief at summary judgment. Okay. Well, the most important part, of course, of any motion for summary judgment was a separate statement. And so we focused on both. The police officer adduced facts with respect to the polishers in general, the fact that the polishers had been on the premises, that it was well known, that most importantly he treated all of these addicts as potentially dangerous. He meaning the police officer? Pardon me? He meaning the police officer? Yes, sir. Well, as I read his affidavit, or his, I guess this is a deposition testimony, he did when he was called out there, when he, I quote, rolled up on them. Right. And this was part, this is part of the problem. This, where TCA is located is several miles away from the city of Barstow. So, you know, I talked to him in his deposition about how the city police department, you know, how often he gets out, you know, to TCA. Okay? And so basically his testimony, well, it's in my patrol area, but it's, you know, in like the southeast quadrant, and I get out there when I can, but most of the time I rely on these people to call me. Well, that's the problem. Hugh Redwoods is out there letting these polishers work in exchange for providing work that he's supposed to be doing. There was testimony that his prior, the man who had his job prior to him was taking kickbacks. So there's prostitutes working on the polisher's row. These methamphetamines are working on the polisher's row. And then there's this disconnect in between what's happening in the field and what the front office general manager is saying. We don't know of any problems. If we had known about problems, we would have done that. I've got one other question about Mr. Woods and his concern about Mr. Ferris. Did he ever report to management that he had a fear that Woods would engage in some sort of violent conduct? We didn't get any information responsive to any of the discovery requests with respect to prior incidents or policy. Did Woods ever relate to management on the site that he was afraid of Ferris, that Ferris was a danger? No. There's nothing in the record that deals with that. He testified in his deposition, though, that he had. Right. And he's a manager. He's a maintenance manager. This is not a waitress who comes in and works part-time. This is a manager. It's his job to take care of the polishers. It was his job to take care of the polishers and to control the premises. Let me ask you this. You've got about four minutes. Do you want to save that time and do it from the other side? Yes, I'd like to. Thank you very much. Good morning. To show your support, I'm Gary Snyder, and I represent TA Travel Centers. I continue to be struck, even after listening to counsel discuss this case, by the fact that there is an elephant, proverbial elephant in this case, that just is being ignored. That elephant is causation. We pled it in our motion for summary judgment. We raise it as a specific issue, number six in the facts. Judge Wright recognized it. By causation, you mean whatever might reasonably have been expected of your client would not have prevented the injury? Exactly right, Your Honor. Okay. Can you say more why you think that that's so on the summary judgment motion? I will. The difficulty I have is that there is case law. There's a case called Abreze that both say that it is up to the plaintiff to demonstrate what the security measures need to be in an instance where there is a landowner requirement to prevent criminal activity or criminal attacks on their property. That has never been raised in this case. That's an issue that the plaintiff and his counsel have avoided at all costs, apparently because they don't want to be pushed into the corner of saying, you should have hired security people. If you had, they would have caught this guy and he wouldn't have injured the plaintiff. They don't want to say it because they know they're going to get pushed into a corner. And what's the nature of that corner? I don't understand what you mean. The nature of the corner is if they say you, defendant, should have hired security personnel, they're going to be unable to prove to anybody that hiring security personnel would likely have prevented this assault. Well, I heard him say a minute ago that they're not arguing that your client should have hired security personnel. They're arguing they should have done other things that would be less onerous for your client to do. Well, in fact, they do argue that. If you look at Mr. Osborne's declaration, not his declaration, but his statement in his opposition, he says, there was no plan or professional security force to keep polishers or ferris off the property. Instead, T.A. relied upon an untrained employee to provide security. That apparently is their claim of how we failed in our duty. Yeah. Let me ask you this, though. I mean, I'm struck by the fact that this case doesn't match very well with most of the California cases in this situation. You heard me discuss this with Mr. Osborne. I did, Your Honor. To the extent that we have a danger, it's a known danger. A known group, the polishers, and within the group, a known person, Mr. Ferris. Are you saying that there's nothing realistically that your client could have done with respect to Mr. Ferris that would have substantially reduced the risk posed by Mr. Ferris to the patrons of the truck stop? Let me clarify a bit from what the court said. There was a known group, the polishers. Right. There was a known individual, Mr. Ferris, who was the assailant. Right. But there was not a known danger. Well, wait a minute. You can't say that at summary judgment, given that Mr. Wood says in his affidavit, I was afraid of him and I wouldn't go within six feet of him. What Mr. Wood said in his declaration was that I was wary of him and I stayed six feet away from him. Yep. There you go. Sounds to me as though that sounds as though he was afraid of him. Otherwise, he wouldn't have stayed six feet away. On a motion for summary judgment in this case where we have the agreed upon fact, that's fact number six, that says there is no evidence as to how long this assailant had been on the premises. That night, yeah. That day. Yeah. Was this all from the daytime or nighttime?  It was during the daytime. Yeah. Yeah. No evidence as to how long the assailant had been on the premises. And, frankly, it's possible that he just walked on the premises at that point, picked up the sign, and cold cocked Mr. Sarber with the sign. There literally, and this is what the trial court found, there is no possibility of a finding that reasonable people can conclude that any security measures that might have been proposed by the plaintiff, and in his opposition, he said, we should have had a security force to keep the Polishers and Ferris off the property, how that would have prevented this attack. Well, if he kept off the property, that clearly would have prevented the attack. Well, you could fence the property off and have people come through gates. No, no. If he was not on the property, that would have prevented the attack. The question is how effective can you be in trying to keep him off the property? Right. Right. The court is absolutely correct in that. Yeah. But, again, we're at that point. Short of security guards and short of? Short of security guards, short of gates, short of badges, short of separating customers from truck drivers from. . . Short of an order to Mr. Ferris that says, you are never again supposed to be on this property unless the next time I see you, I'm calling the cops for trespass. Well, he actually was cited for trespass, if the court understands that, at another TA facility and told to leave. At another facility? Yes. But not at this one? Not at this one, no. Does that help you or hurt you that they did it at another facility? I don't think it makes any difference. We're still dealing with this elephant. . . Do you have any evidence as to how effective it was at the other facility once he was cited for trespass? I don't, Your Honor. That's not on the record. But we're dealing with this elephant of causation, which was never, ever, ever argued by the plaintiff in their opposition to the motion for summary judgment. And it was a clear basis, and Judge Wright said, this is the most substantial basis upon which this motion can be granted, is a lack of causation. And now they appeal. Causation is ignored again. We raise it in our reply. Causation is ignored again. And just out of curiosity, I went through both their briefs last night looking for the word causation. It never occurs. The first time I heard it was today when counsel mentioned causation in a long litany of words. So I believe that the issue here clearly and simply can be decided on the issue of causation irrespective of duty. Now, are you arguing waiver or are you arguing something else? We raised waiver. And I think that that is a strong argument. He's not raised it sufficiently so that it's off the table. We can't now consider it. Is that what your argument is? We can't now consider some of the arguments that he is making, yes, because he didn't raise them at the lower court. But it seems to me as I read the papers here and what I've read of the papers on the lower court, he might not have made the argument in a way that convinced the district court. But everybody knew, including from his statements, that that's part of the issue. It is, okay, how could this have been prevented? Well, I agree. I mean, it was kind of an assumption that I think everybody made. I assumed that they were saying we had to have security personnel out there, just like Ann M. argued, just like everybody else has argued in this long list of California cases. But it was never stated. And now, perhaps a little disingenuously, they're trying to say, gosh, that's really not what we meant. We meant everything but, because all of the cases deal with security forces and the cost of security forces. Well, all the other cases go, so they start out with sort of the gold standard of protection is security forces. But all the cases, not all, but a lot of the California cases talk about other measures that are less onerous, some of the kind of a spectrum of things that you can do. Of course. There are requirements, though, that are placed upon plaintiff's counsel so that the court can compare the foreseeability of the harm against the proposed security measures. Here, we didn't have the proposed security measures except in one comment in the opposition to the motion for assembly judgment talking about security forces. So the proposed security measures clearly, I think, were understood by everybody, although not clearly stated, to be a security force in place on this property. And if we had that, then this accident wouldn't have occurred. Did Woods testify after he said that he was afraid of Ferris, or whatever word to use, weary of Ferris or afraid of him, whatever it was, and that he stood six feet away, kept six feet away from him, did he ever explain why? He did not, Your Honor. Was he asked why? I don't know. Did Ferris ever report any incidents? I mean, did Woods ever report any incidents that Ferris had engaged in? Absolutely none. And, in fact, it was never confirmed, and there is nothing in the record that demonstrates that Mr. Ferris was a methamphetamine user or addict. That's left to speculation here. Everybody assumes. We assume that polishers are all drug addicts. We assume all drug addicts are meth addicts. Since he's close to that group, then he must have been a meth addict. That's why I'm wary of him. All meth addicts are dangerous. I don't want my kids around meth addicts. I mean, we're taking a lot of suspicion. Let me just read to you from Mr. Woods' you guys call it a declaration. In my opinion, I'm on page 105 of the excerpts. In my opinion, the polisher's problem was more under control when the truck stop was owned by Rip Griffins. I'm skipping a moment. When TCA took over the property, less effort was made to keep any polishers off the property. The problem seemed to escalate. Under either owner, I had lots of problems with polishers. The unwritten policy, everyone assumed it was my job, and managers often called me for any security problems since most everyone was afraid of some of the polishers. When I needed help, I would call the police officer because there was no other security available. I saw Jeffrey Wade Ferris four or five times on TCA's property prior to the assault on Kevin Sarver and his arrest. He was a polisher, hung around briefly with Mark Ord. But unlike Mark Ord, I did not trust Mr. Ferris. When I would approach him, I was wary and usually stayed about six feet away from him. I could tell from a distance he was acting weird, and on drugs, I warned him to leave. But he kept coming back because he said he needed money for drugs. I was not there all the time to kick him off the property. To the extent that there is security, obviously Mr. Woods is supplying it. He's not wearing a uniform that says security, but he's obviously been charged by the owners of the property to whatever sort of discipline or orderliness is going to happen with respect to the polisher, he does it. He's quite well aware that Mr. Ferris is a problem. Well, they call him a manager. He's actually a mechanic, was a mechanic that worked out in the engine bays on the trucks that came in. Not a member of management. Did I use the word management? Well, it's here in his declaration he was a maintenance manager. It's in the opposition to the motion for summary judgment. I'm not sure that it's clear in the record what he was. But when you put the name or the title manager next to somebody, suddenly they're elevated to this. Actually, he says I was employed for six years as the head of the maintenance department. Yeah. And his description of his function is it includes, to the extent there's any security provided, he provides it. Now, he's not wearing a uniform that says security. None of that. He's not something that we would ordinarily say, oh, that's the security guy. You're right. You're right. Questions? I was going to say I think this can be cited very simply, very easily, very legally on the causation issue, as did Judge Wright when he made the decision, and I believe that his decision should be affirmed. Okay. Thank you. Mr. Osborne, you've saved a little time. Thank you, Your Honor. First off, let's deal with the causation issue. Causation is a tribal issue of fact in this case. It's really for the jury to decide what would have happened here. Well, if we conclude there's only one conclusion that can be drawn, it can be resolved in a separate judgment. Right. You know. But that's just let me deal with this causation issue for a second. Counsel has overlooked the record, apparently. There is ample evidence in the declaration of J.R. Roberts, who was a security consultant that was hired to opine on this case. And Mr. Roberts reviewed all of the criminal records with respect to truck stops in America and in California. He looked at number 227 here. He read all the evidence in the case, and he submitted a declaration, and it was submitted in the Plaintiff's Separate Statement of Material Facts. And I think it's number 29. Let me just take a look for a second because I think it's important. Mr. Roberts said. What page are you on in your excerpts? I'm going to refer to two pages, Your Honor. The first is page 244. And this was in front of the district court? Yes, it was, Your Honor. And also I would like to refer the court to page 279 and 280. That's 279 and 280 is the separate statement. But let me just read into the record the opinion by the security expert. He says, despite the previous pattern of disruptive behavior, despite concerns of employees including Hugh Redwoods, despite the fact that he had been barred and banned from the premises, the assailant, Jeffrey Wade Ferris, continued to regularly access the property in a free and unfettered manner, creating a foreseeable risk of harm to employee and patron alike. The defendant knew or should have known that a dangerous, potentially violent atmosphere existed on its premises. The defendant failed to create and implement policies that would have reasonably interdicted and interrupted this potentially dangerous condition. The totality of the circumstances would have moved a reasonable and prudent owner and operator of the facility to take corrective actions to remove or reduce the hazard. Okay? And last, but for the failure to implement and provide a reasonable standard of care, more likely than not, the brutal attack giving rise to this litigation would not have occurred. Now, He never says, interestingly, what they should have done. He does say that this is quite a lengthy report. It goes back and starts on page 239. But with respect to the polishers, Your Honor, remember, it's their policy to allow the polishers on the premises. This isn't a case where somebody comes on and they say, Oh, my God, we never thought this crazy lunatic would do anything harmful. They knew they had a pot full of crazy lunatics in their back lot. They had a duty to keep all polishers off the premises. Absolutely. At whatever expense. Whatever expense? Yeah. Security guards, fences. How about Mr. Woods doing his job? His job was maintenance department. No. No. His job, his title was maintenance manager. But his, Your Honor, just read what he was actually tasked to do as part of his maintenance. As part of his maintenance responsibility. If anyone wants to have their cake and eat it too, it's the defendant. He doesn't want to hire security guards. And then he wants to say, Well, if anything happens, it's not our fault. We might know that we've let lunatics loose at the asylum. We might know they're drug users. We might know that the police know that these people shouldn't be doing this. We might know there's prostitutes out there. But as long as we keep our head in the sand and we don't hire anybody to take care of this problem, then we're liability free. Your Honor, in a sense, your argument is in a way that the TCA's created the condition. That is to say, not only are they not preventing it, they've created it by inviting these people onto the premises. That's 100% the argument that I made before the trial court in my papers that I never got to. 100% responsibility based on respondeat superior and vicarious liability. Instead, the trial court focused in strictly on the issue of the foreseeability of an assailant. And the trial court completely missed the forest to the trees because we were cut off from making that argument. But it's extensively in the record. You were given a chance to file both an opposition, an amended opposition. And I did read both your opposition and your amended opposition. And this is all new. All right. May I have a moment to look at the argument on respondeat superior? Your argument now is that if they had not allowed the polishers at all on the premises, never would have happened. Letting the polishers on the premises was the cause. Yes. The cause of your client's injury. Letting the polishers on the premises was the cause of the assault. That's because all polishers were dangerous. Well, the police thought so in Barstow. No, I don't care what the police thought. Your argument is that all polishers were dangerous. Mr. Ferris was a polisher. Therefore, he was dangerous. And not only that, there's this statement by Mr. Woods that Mr. Woods was wary of him. Well, that's an admission against the interests of the corporation. The defendant tasked Mr. Woods. So by not taking steps to remove this condition, the polishers and Mr. Ferris, and doing whatever it basically took, they breached their duty, and that was the cause of your client's injury. Yes, but I'd like to add one thing. Not only the failure to prevent polishers, but the affirmative policy, unwritten policy of encouraging it. Mr. Woods explained in his declaration. He said, on one hand, we wanted to keep the lot kind of clean, but on the other hand, many of our truckers liked this polish, this hand polish. These guys polished the chrome wheels by hand. And right next door, there's a shop that does it. But it does it by machine. But the machine scratches the chrome wheels. So the truckers liked the hand polish, if they can get it. So Woods explained it. And he said, on one hand, I'm supposed to keep them off, but on the other hand, it was good for business. Now, this is maybe a fancier word to dress up an informal arranger. It sounds as though the polishers are concessionaires. Right. Well, that's what they were doing in the truckers' world. Okay. Got it. Okay. Thank you very much. Thank both of you. Starver v. TCA, submitted for decision. And the Court is now on adjournment until tomorrow morning. Thank you very much.
judges: Fletcher, Paez, Duffy